UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| V. | ) | No. 2:10-CR-108 |
| | ) | |
| RICKY VERNON BRYANT | ) | |
| SHERLENE CONYERS | ) | |

## **REPORT AND RECOMMENDATION**

The defendant Ricky Bryant has filed two pretrial motions to suppress evidence: a motion to suppress any evidence seized upon the search of his residence and barn (Doc. 20), and a motion to suppress any statements he made to law enforcement agents (Doc. 21). These motions have been referred to the magistrate judge pursuant to the standing order of this court and 28 U.S.C. § 636. An evidentiary hearing was held on January 18, 2011.

*FACTS*

On September 27, 2010, the Cosby branch of the National Bank of Tennessee was robbed by a male individual wielding a rifle. The robbery itself was recorded by the bank's camera security system. Witnesses advised law enforcement officers that the robber drove away in a green Jeep.

The robber escaped with over $200,000.00 in currency, plus bank receipts, and a dye pack.

Later that day, a man hunting in a remote mountainous area of Cocke County came upon some dye-stained currency, which he turned over to authorities in Sevier County, where

he lived. The Sevier County authorities immediately called the Cocke County Sheriff, who dispatched Detective Derrick Woods to interview the hunter. Detective Woods retrieved the stained currency from the hunter, and learned from him the area where he had stumbled across it.

This portion of Cocke County is served by Nations Road, which is a one-lane, unpaved, gravel road. By the time Detective Woods arrived at the area, it was dark. Nevertheless, after searching in the area described to him by the hunter, Detective Woods found a rifle, partially wrapped in cloth, and at least some of the dye-stained bank receipts taken during the robbery. The rifle appeared to be the weapon used by the robber as shown by the surveillance camera recording.

The next morning, September 28, Sheriff Fontes and Chief Deputy Carroll went to the area, and they discovered the bag which originally contained the stolen money and the dye pack.

As already noted, this area is remote, and it is relatively sparsely populated. In this immediate area there were two homes nearby, one of which was defendant's. Nations Road essentially turns into defendant's driveway and ends at his property line. However, no one in the immediate area, including this defendant, was a suspect; indeed, none of the officers even knew who lived in the two homes.

After finding the empty, dye-stained bag, Sheriff Fontes and Chief Deputy Carroll left to get a four-wheeler, presumably for them to use to travel up and down the slopes through the woods to search for additional evidence of the robbery. Detective Woods, in the

meantime, was looking for a place to turn his large vehicle around. He drove his vehicle in the direction it was already headed, which necessarily took him to defendant's property line, where Nations Road metamorphosed into defendant's driveway. Defendant's property consisted of approximately 50 acres, improved by a dwelling house and a barn. It is heavily wooded.

It is difficult to explain in words the configuration of Nations Road in this area. As one approaches defendant's property, the road forks to the right, leading to an unnamed neighbor's residence. If one bears to the left, as Detective Woods did, he arrives at defendant's property line, which was gated. Photographs submitted by defendant show that on one of the gate posts was a "No Trespassing - Keep Out" sign. Detective Woods testified that he never saw that sign, although acknowledging that it could have been obscured by brush and weeds at the time. In any event, it is irrelevant as far as defendant's motion to suppress is concerned; it is assumed that the sign was there at the time. The gate itself was standing open.

Again, it bears repeating that Detective Woods not only did not suspect defendant as the robber, he did not even know who lived in either of the houses. He was merely investigating a crime, evidence of which had been found nearby.

As Detective Woods approached the house, he saw a green Jeep matching the description of the vehicle used by the robber. The vehicle itself was extremely dirty, but Woods noted that the tag on the vehicle was clean.

Detective Woods immediately called his Sheriff. When the Sheriff arrived, Detective

3

Woods went to the house and knocked on the door, getting no answer. Based on defendant's motion, he was in his house and aware of the officers' presence. The only conclusion that can be drawn is that he refused to answer the knock on his door. *See*, Doc. 20, p. 2. As the Sheriff was standing beside the Jeep, he glanced at the area behind the house and saw what he believed to be marijuana. He walked to the plants and confirmed his initial impression.

At this point, the officers still had no idea who lived at the house, and they left.

Either on September 29 or September 30, an anonymous caller reported to the Sheriff that the Jeep used in the robbery was located on defendant's property. The caller reported that defendant owned *two* Jeeps, and that defendant was swapping tags between those two vehicles.

Detectives Crider and Woods returned to defendant's residence. Defendant, of course, was now a suspect, and the officers wanted to talk to him. Receiving no response to their knock on the door, they walked up to a barn which was located on the ridge behind defendant's house to see if he was there. The lane leading to this barn was approximately 500 yards in length. It was blocked by a locked gate which the officers walked around. Had the detectives been willing to clamber up the side of the hill through the woods and brush, the straight-line distance between house and barn was approximately 150 yards.

The detectives looked in the barn, which was unlocked, in hopes of finding defendant. What they saw was a second Jeep vehicle, similar to the one parked at the residence and of course similar to the one used in the robbery.

At this point, the two detectives "backed off." They called the Sheriff and reported

4

what they had discovered.

The Sheriff ultimately found the defendant at his ex-wife's home on Golf Course Road in Newport, approximately eight miles away.

The Sheriff, accompanied by Chief Deputy Carroll and the defendant, drove back to defendant's residence on Nations Road. Defendant was not arrested or in the functional equivalent of custody; the Sheriff had offered to allow defendant to drive himself, but he elected to ride with the Sheriff. During the drive to his house, defendant mentioned the bank robbery. The Sheriff responded that they had found a vehicle on his property that matched the description of the vehicle used by the robber, but he pointedly did not mention the second Jeep found in the barn by Woods and Crider. The Sheriff quickly changed the subject to more innocuous matters.

When defendant arrived at his house, Detective Woods wrote out a consent to search, which defendant signed (Exhibit 4). He was not handcuffed, and everyone was cordial.[1] There were no threats of any kind made to defendant. Based on statements in his motion, he was aware that the officers knew of the Jeep parked outside his house; the officers, however, were unaware that *defendant* knew of their prior visits.

In the Jeep parked in the barn, the officers found a roll of tape of some sort that matched the description of tape used by the robber in an attempt to disguise the getaway vehicle during the robbery.

---

[1] The officers' various conversations with defendant were recorded, Exhibits 6, 7, and 16.

Defendant ultimately was transported to the Cocke County Jail by the Sheriff. He was still not under arrest. Defendant rode in the front passenger seat and Agent Scown of the Federal Bureau of Investigation rode in the back seat.

At the jail, defendant was given a Waiver of Rights form which was explained to him, and which he signed. (Exhibit 5). Again, everyone – the officers and defendant – were cordial and polite. Defendant answered a series of questions, but he never admitted that he committed the robbery. During the questioning, Agent Scown told defendant that "they" – meaning law enforcement officers – already knew "everything," including the fact that defendant committed the robbery. However, there were never any threats made to, or hostility directed toward, defendant by any law enforcement officer.

## *MOTION TO SUPPRESS SEARCH OF RESIDENCE AND ADJOINING LAND AND OUTBUILDINGS (DOC. 20)*

Defendant recites in his brief that on September 28, he observed seven to ten deputies come upon his land with their guns drawn; that one deputy rode a four wheeler toward his barn; that another deputy, with weapon drawn, knocked on his front door; and then another deputy took photographs.[2] He says that there was no search warrant left on the premises and he had never given consent to that search. The officers, of course, had no idea defendant was in the house; they had knocked on his door and no one answered.

He then argues in this motion that on September 30, when the Sheriff and three or four deputies came to his ex-wife's house, he was told by the officers that they had information

---

[2]Doc. 20, p. 2.

about a vehicle located in his barn, and that his subsequent execution of the consent form written by Detective Woods was effectively the result of duress and coercion and, moreover, was tainted by the prior unconstitutional search.

*DETECTIVE WOODS' ENTRY ON SEPTEMBER 28*

Due to the trees, terrain, and curvature of the road, Detective Woods did not see the Jeep parked outside defendant's house until he had traveled a goodly distance beyond the gate. The questions are: was Detective Woods entry lawful under the Fourth Amendment, and was his observation of the Jeep vehicle outside the house a search?

Detective Woods was looking for a place to turn around. He had at least one and perhaps two places where he could have turned around short of passing through defendant's gate and onto his property. But Detective Woods also testified that he was seeking information regarding evidence of a bank robbery that was found in the immediate vicinity. It should be emphasized that Detective Woods was not "investigating" whomever happened to live in that house; he was simply seeking information that hopefully would be of some assistance to him. He had no suspects.

The Fourth Amendment proscribes "unreasonable" warrantless searches and seizures. What is reasonable or unreasonable is dependent upon what the Supreme Court has determined to be an individual's *reasonable* expectation of privacy, which in turn is that expectation of privacy which society is prepared to recognize as reasonable. *Rakas v. Illinois*, 439 U.S. 128 (1978); *Katz v. United States*, 389 U.S. 347 (1967).

As sacred as the home is, society is not willing to accept as reasonable an

expectation that a police officer may not question a resident of a dwelling to ascertain if that resident has any information regarding the commission of a criminal act that occurred nearby, or evidence of a criminal act which was discovered nearby. Stated another way, it is not unreasonable for a police officer to come upon private property, even in the face of a no trespassing sign, to ask if the resident has any information that will aid in the investigation of a crime.

Further, the somewhat arcane issue of curtilage comes into play. Although the court does not recall if there was any testimony regarding the distance from the gate to the house, it clearly was a significant distance as shown by the aerial photographs filed as exhibits. In determining the extent of the curtilage, "the primary focus is whether the area in question harbors those *intimate* activities associated with domestic life and the *privacies of the home."* United States v. Bunn, 480 U.S. 294, 301, fn. 4. (italics supplied). Defendant's Keep Out-No Trespassing Sign does not, in and of itself, establish the extent of the curtilage; if it did, there are ranches in Texas containing thousands of acres that could be entirely encompassed within a home's curtilage merely by the erection of a "keep out" sign at the perimeter. *Id.*, 304. To state it succinctly, defendant's curtilage did not start at his gate, and neither did it start until a point long after Detective Woods was able to see the Jeep which was in plain view.

So, when Detective Woods went upon defendant's property on September 28, he was (1) looking for a place to turn his vehicle around, and (2) seeking anyone who might have knowledge of the evidence found in the woods alongside Nations Road. This was not

entry upon defendant's property that violated defendant's *reasonable* expectation of privacy. Additionally, Detective Woods was well outside the curtilage when he was able to observe the Jeep. For either of these reasons, Detective Woods' entry was not a violation of the Fourth Amendment.

*THE OFFICERS' ENTRY LATER IN THE DAY ON SEPTEMBER 28*

As a result of his observation of a vehicle that matched the description of the car used in the robbery, Detective Woods called the Sheriff who shortly arrived at defendant's property along with other officers. From his motions, it is apparent that defendant was in the house and essentially hiding; at least, he chose to conceal his presence from the officers. Other than the cultivated marijuana, with respect to which defendant is not charged, the officers saw nothing beyond what Detective Woods saw earlier that day, the green Jeep parked outside the house.

*THE OFFICERS' VISIT ON SEPTEMBER 30 AND DEFENDANT'S CONSENT TO SEARCH*

Either on September 29 or 30, the Sheriff had received an anonymous tip that there were two Jeeps on defendant's property, one of which was the vehicle used in the robbery, and that defendant was taking the tag off one vehicle and placing it on the other. By now, defendant clearly was a suspect in the robbery. Woods and Crider returned to defendant's property to talk to him.

As before, Woods received no response to his knock on the door. They could see his barn up on the ridge behind defendant's house, approximately 150 yards away, and

9

they wondered if he might be there. Rather than hike through the woods and up the slope, they elected to use the lane or road, which increased the distance by over 3 times. Before reaching the barn, they encountered another gate, this one closed. Since they were on foot, they merely went around the gate and walked on to the barn. When they looked in the barn, they saw the second green Jeep.

Again, the extent of the curtilage becomes an issue. Whether the straight-line distance of 150 yards is considered, or the "by road" distance of 500 yards, the barn was well outside the curtilage of defendant's dwelling. *See, Dunn, supra*. Although they were looking for defendant, and not necessarily for evidence of his complicity in the bank robbery, it makes no difference; whether looking for defendant, or searching for evidence of a crime, the barn was outside the curtilage and not within the ambit of the Fourth Amendment.

Later, when the Sheriff and defendant arrived at the property, Detective Woods asked defendant if he would consent to a search of his property. As the recording of their conversation reveals, the detective explained politely and carefully to defendant that he had the right to refuse. Defendant clearly understood that he did have the right to refuse; interestingly, defendant himself suggested a revision to the consent form as written out by the detective.

Defendant argues that his consent to search the premises was invalid because his consent was superfluous in light of the officers' knowledge. A suspect's knowledge of a prior illegal search can give rise to a sense of futility that the victim has no choice but to comply. *United States v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002). However, it does not

inexorably ensue that a consent executed after a prior illegal search is ineffectual: "When consent follows an illegal search, the [g]overnment must demonstrate that 'consent was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion.'" *Haynes*, 301 F.3d at 682.

As discussed later in this report, defendant is not weak-willed or timid. Detective Woods was extremely polite to him and explained fully his right to refuse to consent to the search, and defendant was sufficiently self-possessed that he even suggested an alteration to the consent form as it was being prepared by Detective Woods. His consent was an act of his free will, untainted by the officers' prior illegal intrusion, if those intrusions should be so characterized.

## *MOTION TO SUPPRESS STATEMENTS (DOC. 21)*

It is axiomatic that an incriminating statement or confession, to be admissible against the utterer, must be free and voluntary, and not motivated by any duress or coercion. Defendant correctly notes that the "totality of the circumstances" must demonstrate that a defendant's statement was the product of the free and unconstrained choice of its maker, *citing Schneckloth v. Bustamonte*, 412 U.S. 218, 273. The issue is whether the defendant's statement or confession was the product of his voluntary and knowledgeable action, or whether it was the result of his will being overcome by that of his interrogators. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994).

Defendant complains that he was told by the officers – actually, it was Special Agent Scown of the FBI – that they (the officers) already knew what happened; that they knew that

he had robbed the bank; that he should "help the judge understand;" and that "without any doubt, you robbed that bank on Monday."

Defendant signed a Waiver of Rights form after it was explained to him. Although defendant did not testify at the suppression hearing, from prior hearings the court recalls that defendant is (or, at least, was) a businessman in Newport, Tennessee, and he is far from being weak-minded or easily subject to manipulation. There was no duress or coercion of any kind *unless* Special Agent Scown's statements to defendant – all of which were to the effect that they already knew he was the robber – should be deemed coercive. They should not: "A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *Ledbetter,* at 1070 (6th Cir. 1994). As pointed out by the court in *Ledbetter*, "an innocent defendant in [these] circumstances . . . would have little incentive to render a false confession." *Id.*

In short, the United States has carried its burden of proving, by a preponderance of the evidence, that defendant's statements were free, voluntary, and not the result of any coercion or duress by law enforcement officers.

## *CONCLUSION*

It is respectfully recommended that defendant's motions to suppress, Docs. 20 and 21, be denied.[3]

Respectfully submitted,

---

[3]Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1).

s/Dennis H. Inman
United States Magistrate Judge